CHARLES L. ORTMANN v. JAMES H. PLUMMER, GEORGE H. VAN ETTEN, GEORGE CAMPBELL, ORLANDO M. BARNES, THE JACKSON, LANSING & SAGINAW RAILROAD COMPANY ET AL.

*Escrow, bailment or agency—Lien on equitable title.*

1. Delivery of an assignment of a land contract into the custody of one of the partners in a firm to which it is assigned can hardly be con-

sidered a delivery in escrow, to operate until the assignee shall execute a mortgage back, in a case where both the assignment and the contract have first to be delivered to the other party to the contract in order to obtain from him a deed on which to base the mortgage. If such a delivery be accompanied by a parol agreement as to the terms of the transfer, it cannot, under the Statute of Frauds, be regarded as a trust, but is rather a bailment or agency.

2. A vendor's right to a lien it not, *it seems*, confined to the sale of a legal title or of a title in fee, but extends to equitable titles subject to the risk that bona fide purchasers from the legal holder may intervene and break it.

3. Where the purchase price of one parcel of land is so blended, in a mortgage, with that of another, that it cannot be separated, no lien beyond the mortgage itself can properly be enforced.

4. Whether a lien may not continue, if so agreed, where other collaterals are taken—*Q.*

5. O. had 2000 acres of pine land and held a contract from a railroad company for about 5000 more. A certain firm which had contracted for the smaller parcel agreed also to take the contract for the larger, subject to certain sums thereafter to fall due. O. was to give the firm a deed of the smaller parcel and have a lien on the larger for what they owed him on both. The firm were to get a deed of the larger parcel from the railroad company, and mortgage it, first to the company for what was left unpaid, and next to O. to secure their debt to him. This arrangement was oral. The company, however, refused to give a deed until the larger parcel was all paid for, and this refusal prevented the fulfillment of the arrangement in its terms. The firm changed, and its successor, after paying the company a sum which the latter insisted on applying in part upon other contracts, became bankrupt, and P., having obtained so much of its assets as concerned the property in the railroad lands, asked the company for a new contract for the larger parcel. The company refused, but agreed to consolidate all contracts in one, which P. took, and under which he made large sales. Everybody had notice of O.'s rights. *Held*, that as the company had denied O.'s lien and tried to destroy it, and by compelling the consolidation of the contracts had made it impossible to separate the payments, and by such consolidation had obtained for the larger parcel enough more than the contract price to render it liable for the money due to O., it must pay him that amount.

Appeal from Bay. (Green, J.) Oct. 11.—Dec. 20.

BILL to enforce lien. Complainant appeals. Reversed.

*A. McDonell* and *Isaac Marston* for complainant.

*Hatch & Cooley* and *Hanchett & Stark* for defendants.

CAMPBELL, J. The bill in this case was filed to enforce rights growing out of a lien claimed for unpaid purchase money of a tract of timbered land. In 1874 a firm which had become interested, under the name of Van Etten, Campbell & Co., in the assets of a previous firm, were holders of a contract for 2209 acres, partly paid for, which had belonged to complainant and others, and then were practically complainant's. At the same time complainant and one Boeing held a contract for 4892.86 acres, originally made by the Jackson, Lansing & Saginaw Railroad Company to Dexter A. Ballou, on which some payments had been made, and future payments were also to mature, $8673.68 and back interest, due April 1, 1874, and about $26,000 in three payments annually thereafter.

In February, 1875, an agreement was made to sell this contract to Van Etten, Campbell & Co. subject to the sum of $26,000, which they were to assume, complainant agreeing to take care of the rest. They were to pay complainant for his interest $25,675. None of this purchase price was to be paid down, but the arrangement was as follows : This sum, added to what was unpaid on the 2209 acres, made up $42,000. This was to be divided up into seven notes, payable as follows: One for $8000 due August 1, 1876 ; one for $8000 due November 1, 1876 ; one for $4000 due June 1, 1877; one for $4000 due August 1, 1877 ; one for $6000 due November 1, 1877; one for $6000 due June 1, 1878 ; and one for $6000 due August 1, 1878, all on interest. A deed for the 2209 acres was to be delivered, and a mortgage given to complainant for $22,000, including the last four notes. Complainant was to have a lien on the 4892.86 acres for the whole $42,000. He was to pay the amount not assumed by Van Etten, Campbell & Co., who were to make the remaining payments, and who were, as soon as possible, to get a deed from the Railroad Company and give back a mortgage for what remained unpaid to the railroad, and then execute a second mortgage on the tract

to secure the $42,000. Complainant paid what he had agreed to, but the Railroad Company, which had previously been in the habit, after receiving certain preliminary payments, of giving deeds and taking back mortgages for the remainder, declined, under its new commissioner, Mr. Barnes, to continue that custom, and refused to give a deed before full payment. This made it impossible to carry out the terms of the purchase literally. These had been left in parole. The deed and mortgage were executed on the smaller tract, and the notes given. The Railroad Company are shown, in our opinion, to have had full notice of the complainant's claim. It was expected and understood that Van Etten should hold all the papers until the agreement was properly carried out.

Van Etten, Campbell & Co. became in the year 1876, by transfer from the other partners, changed into Campbell & Campbell, who in that same year made a payment to the Railroad Company of $15,000. The company, however, claim this payment was not made on the Ballou contract, but upon a consolidation of that with three certain other contracts made with the predecessors of Van Etten, Campbell & Co. on other lands, and in default. The lands covered by these other contracts had ceased to be valuable, and were not worth nearly the sum unpaid on them.

The facts are disputed concerning this consolidation. It is claimed on the one hand that Van Etten agreed that they might all be put together, and left the Ballou contract with the company in that view. But it also appears that it was not regarded as surrendered for any supposed forfeiture, and that it was not agreed by Campbell & Campbell that it should be regarded as extinguished. Complainant was not consulted, and did not agree to it. And in November 1876, Campbell & Campbell received the original contract, with a written assignment from Van Etten, Campbell & Co. These papers subsequently got into the hands of the Railroad Company in some way, but we do not think they were treated as forfeited, and it is not, in our opinion, true that Campbell & Campbell regarded the contract as ended in

any way. Complainant was not a party to any such arrangement. Whatever talk there may have been about consolidating the contracts, it was never done in fact, and it could not have been done without operating as a legal fraud on complainant, if he had any claim on the Ballou contract. That was the only one having substantial value.

Of the notes not covered by the mortgage on the smaller tract, two of $6000 each were paid. The $4000 note was not paid. That mortgage was foreclosed, and but a small sum was realized, leaving the bulk of it unpaid, amounting with interest to nearly $28,000 when this bill was filed.

Sometime in 1877 Campbell & Campbell became bankrupt, and their property was subsequently transferred by the assignee for the benefit of the Canadian Bank of Commerce. Defendant Plummer in 1878 acquired so much of these assets as relate to the property in any of the railroad lands. Plummer afterwards desired to get from the Railroad Company a new contract for the lands in question. The company refused to do this, and Mr. Barnes insisted on putting all of the contracts before referred to in one new contract for the whole amount due on them. A compromise was made on the amounts by a reduction of $2000, and Plummer took out a new contract to himself and Alexander Faulkner for a consideration of $42,000, paying down $12,000. He afterwards acquired Faulkner's interest, and made sales of parts of the lands for considerably more than the whole purchase money.

Included in the purchase of Campbell & Campbell's assets was a large amount of sawed and unsawed lumber, of which about two million had been certainly cut and then remained on the lands in controversy, and the balance is claimed to have been so cut in whole or in part. This cutting was not authorized by the contract from the Railroad Company, and the title legally remained in the company. It was however allowed to pass to Plummer & Faulkner and they disposed of it.

Before the contract was taken out by Plummer & Faulkner a bill was filed and injunction issued in favor of Ort-

mann, setting up the same facts involved in this cause, and they had full notice of them. It does not clearly appear why that suit was dropped, unless from the necessity of some supplemental or amendatory allegations.

Inasmuch as the chief defendants are all affected by sufficient notice of such equities as Ortmann possessed, without reference to the doctrine of priority among equities, the important question is whether he has such equities as can be enforced.

There would be some difficulty in holding the delivery of the assignment from Ortmann and Boeing to the custody of Van Etten as an escrow. Apart from the question of his personal interest in the assignment, on which we need not pass, the arrangement contemplated that the contract should be exchanged for a deed to be issued by the company before the return mortgage to complainant could be executed. To obtain this the assignment would have to be delivered up with the contract to the railroad company. This would be inconsistent with such a delivery in escrow as would extend until the execution of the mortgage. That theory, therefore, cannot prevail.

The Statute of Frauds stands in the way of any trust in Van Etten. And if he held the papers, as we think it was meant he should hold them, it was rather a bailment or agency than a trust, although involving similar duties. But we do not think that the testimony shows any denial by Van Etten, Campbell & Co. of the rights of Ortmann. All parties knew of them, but not being put in writing they cannot be enforced specifically, just as was intended. The form of the contract did not require the Railroad Company to convey before payment, and the understanding between Ortmann and his assignees, being based on the expectation of a deed, made no provision for any new security but a mortgage of the fee.

It still remains to be seen how far he is protected by his lien as vendor, for unpaid purchase money.

The right of a vendor to a lien does not seem to be confined to the sale of a legal title or title in fee. The leading

case of *Mackreth v. Symmons* 15 Ves. 329 (1 Leading Cases in Equity 194 and notes) was one relating to what was treated as an equitable title. The doctrine has been applied to copy-holds, and appears to be received as to all recognized titles. See Adams' Eq. (7th ed.) 128, and notes; *Winter v. Lord Anson* 3 Russ. 488. The lien on an equitable title may no doubt be more uncertain, by reason of the danger that bona fide purchasers from the legal holder may intervene and destroy it. But subject to that risk (which is not confined to equitable estates) it may be upheld. In the present case the legal title is still in the railway company, having knowledge of the equities, and defendants are not bona fide purchasers. We see no difficulty in the nature of the title.

Another question, not so simple, arises from the alleged waiver of any lien, if it ever existed. It will be seen that the price of the smaller tract of land was less than the mortgage put upon that land by $5680, so that this latter amount of the purchase money of the larger parcel was included in that mortgage. It was not kept separate, but was included in the sum of $22,000 in four notes expressly secured. Upon the settled principles applicable to mortgages, all unpaid notes stood secured ratably and not in order of time. While the authorities are not clear that a lien may not continue, if agreed, even where separate collaterals are taken, yet when the purchase money of one parcel is so blended with that of another in a mortgage as to prevent their separation, we think there would be too much confusion created in the enforcement of a lien beyond the mortgage itself, to justify the attempt.

But we see no difficulty in sustaining the lien for the unsecured notes. It is shown distinctly that the lien was positively agreed on, so that there was no waiver, and no security but a personal liability of the vendees. Two of these unsecured notes are paid, but a third, of $4000, is unpaid, and should in our opinion stand secured by the land.

The question then arises, how is it to be provided for?

Plummer bought the land subject to this lien, but as between him and the Railroad Company he is entitled to a clear title. The Railroad Company has put itself in the position of denying the lien and doing what it could to destroy it. The timber cut and transferred to Plummer would probably have paid the amount of this note, but whether it would or not, there is no doubt that the amount exacted of Plummer by compelling him to put all the contract lands together, has not only made it impossible to separate his payments, but has also obtained for the Ballou lands a price exceeding the contract price very largely. In our opinion the Railroad Company has been paid and secured enough to render it liable to complainant for the amount of the $4000 note and interest, and should be decreed to pay it with costs of both courts to complainant. The other defendants to pay their own costs. Had the lien been enforced for the rest of the purchase money a further reference would have been proper to settle the equities. But we have no doubt that the company should pay the note in question, and no reference is needed.

The decree must be reversed with costs as above mentioned, and a decree for complainant entered accordingly, with a lien on the land unless paid, to be enforced by sale, if necessary, free of incumbrance.

GRAVES, C. J. and SHERWOOD, J. concurred. COOLEY, J. did not sit in this case.